State on the relation of THEOPHILUS WHITE, Chief Inspector,
v. GEORGE H. HILL and Others.

(Decided November 21, 1899.)

*Quo Warranto—Statute Repealing, or Amendatory—Title
to Office—Chief Inspector Under Act 1897, Chap. 13,
to Promote the Oyster Industry of the State.*

1. It is well settled that an office is property; the Legislature may
abolish an office of its own creation, but can not, as long as
the office remains, deprive the officer of the material part of
his duties and emoluments. *Abbott v. Beddingfield*, and
*McCall v. Webb*, at this term.

2. The provisions of the Act of 1899, chap. 19, establishing the Shell
Fish Commission, are in substance the same as those in the
Act of 1897, chap. 13, promoting the oyster industry in North
Carolina.

CIVIL ACTION in the nature of *quo warranto,* heard upon
the pleadings by *Bowman, J.,* at May Term, 1899, of PAM-
LICO County, for the recovery of the office of Chief Inspector,
under Act 1897, chap. 13, to promote the oyster industry in
North Carolina.

The complaint alleges that by virtue of said act the plain-
tiff was appointed to his said office by the Governor on 22nd
February, 1897, for a term of 4 years from that day, but
that he has been illegally ousted from his office by defendants,
who claim to hold the office of Shell Fish Commissioners,
under Act of 1899, chap. 19.

The answers allege that by virtue of said Act of 1899,
chap. 19, and proceedings held in compliance therewith, they
are rightfully in possession of their office of Shell Fish Com-
missioners, and that the office claimed by the plaintiff was
abolished by the legislation of 1899.

WHITE v. HILL.

His Honor, upon the hearing, rendered judgment in favor of plaintiff. · Defendants appealed.

*Messrs. Simmons, Pou & Ward;* W. B. Rodman, and *David L. Ward,* for defendants (appellants).
· *Messrs. W. H. Day* and *J. C. L. Harris,* for appellee.

FAIRCLOTH, C. J., writes the opinion of the Court.
CLARK, J., writes dissenting opinion.

FAIRCLOTH, C. J. The plaintiff was duly appointed by the Governor "Chief Inspector" in February, 1897, for a term of 4 years, under an Act 1897, chap. 13, sec. 12, to provide for and promote the oyster industry of North Carolina. The defendants claim that plaintiff's office was abolished by the Act of 1899, chap. 18, sec. 3, and that he is entitled to the office as a Shell Fish Commissioner under and by virtue of the Act of 1899, chap. 19, passed at the same session of the Legislature.

The above statement presents the question so frequently presented to this Court in recent years, that is, whether the act relied upon by the new claimant is amendatory of a previous act, under which the other claimant (the plaintiff in this case) asserts title, or whether it is an absolute repeal and the substitution of a new system or scheme for the government and regulation of the same subject matter. As the argument and reasons' have been so often stated by this Court, we deem it quite unnecessary to repeat them. We may say, however, that it is well settled that an office is property; that the Legislature may abolish an office of its own creation; that it may, when not in conflict with the organic law, increase or diminish the duties of an officer; but it can not, as long as the office remains, deprive the officer of the material part of his duties and emoluments, and that the oath and salary are the incidents of an office, but no part of its duties.

Many of the decided cases for the above propositions and the general doctrine, are cited in *Abbott v. Beddingfield,* at this term, as well as in *McCall v. Webb,* at this term.

Are the provisions of the Act of 1899, chap. 19, establishing the Shell Fish Commission the same in substance as those in the Act of 1897, chap. 13, promoting the oyster industry in North Carolina? A careful reading shows that they are. The name, the methods and details are different, but the same general object is found in both acts. The Act of 1899, chap. 18, expressly provides for the amendment of certain sections of the Act of 1897, and by sec. 3 repeals sec. 12, under which the plaintiff was appointed, and the same act, chap. 19, provides for the general supervision of the shell fish industry in North Carolina, and then prescribes in detail how the Commission shall perform the duties assigned to it. The reading of a few sections of each act will show the truth of the matter:

1897.   Sec. 12 compared with sec. 2.   1899.
1897.   Sec. 12 compared with sec. 4.   1899.
1897.   Sec. 12 compared with sec. 5.   1899.
1897.   Sec. 12 compared with sec. 8.   1899.

These refer to material matters and will do for illustration.

In the argument it was said that the Act of 1897, chap. 13, had for its object "catching and inspecting oysters," whereas, the Act of 1899, chap. 19, had in view the "general supervision of shell fish," and that, therefore, the subject matter of the two acts was not substantially the same. There was no attempt by counsel to mark the distinction, and we have no disposition to undertake the task, but will let our opinion rest upon the ground already stated.

We have thought it not improper to look back and see if

the Legislature has had in mind any distinction in that respect. The Code, vol. 2, p. 424, contains all the legislation prior to 1883, under the general head of "oysters and other fish." The Act of 1885, chap. 84, forbids the Superior Court Clerks of Onslow and Pender counties to license any person to stake off oyster gardens in certain limits within those counties. The Act of 1887, chap. 90, sec. 1, authorizes the Justices of the Peace of Onslow County to appoint three citizens interested in the oyster industry as a "Board of Shell Fish Commissioners," with jurisdiction over "all the grounds and shell fisheries relating to the oyster culture" in their county. Sec. 8: The County Treasurer "shall keep the shell fish funds separate . . . . . . and pay out of the oyster fund all verified orders drawn on him by the Board of Shell Fish Commissioners," and pay over any balance of the oyster fund, and he and his bond are made liable for all moneys coming to him "from such shell fisheries." The Act of 1889, chap. 298, to promote the "cultivation of shell fish in Onslow County" provides for the Board of Shell Fish Commissioners to be paid from "taxes laid upon oyster grounds," and other accounts to be paid upon the order of the said Board. It further provides how any person "may raise or cultivate oysters or other shell fish on any ground in the county. The Act of 1891, chap. 419, provides that all applications for oyster grounds must be made to the "Board of Shell Fish Commissioners," etc.) The Act of 1891, chap. 200, entitled "An act to perpetuate the landmarks of oyster grounds in Onslow County and to facilitate the catching of *migratory* fish," puts the oyster lands under the control of the Shell Fish Commission. Webster's International Dictionary defines shell fish thus: "Any aquatic animal whose external covering consists of a shell, either testaceous, as in oysters, clams and other mollusks or crus-

taceous as in lobsters or crabs." Worcester also describes shell fish as follows: "The term is chiefly applied, in commerce, to crabs, lobsters and croyfish, oysters, muscles, periwinkles and whelks."

Upon the above review, we are not prepared to say that the Legislature has declared or drawn any distinction between oysters, shell fish and "migratory fish."

It was also urged that, in order to sustain the plaintiff's contention, this Court must overrule *Ward v. Elizabeth City,* 121 N. C., 1. That contention was discussed and decided adversely in *Abbott v. Beddingfield,* at this term, and the fallacy of the argument made apparent.

We are, therefore, of opinion that no error was committed in the Superior Court in trying this case.

Affirmed.

CLARK, J., dissents for the reasons given in the dissenting opinion in *Abbott v. Beddingfield,* at this term; and for the further reason that chap. 19, Laws 1899, under which the defendants claim, provides an entirely different system from chap. 13, Laws 1897, under which plaintiff claims. The territory covered is changed, the compensation is changed. The old act applied only to oysters, the Act of 1899 covers all shell fish, including clams, crabs, etc. The clam industry of the State is a great one, and it is well known that within the last 2 years the crab industry has become of large proportions. These industries are palecd under the protecting care of the Board of Commissioners. Who now exercises the functions formerly exercised by the Chief Inspector? Clerks of the Superior Courts of the various counties exercise some, the Secretary of the Board some, the Secretary of State some, and about the only one exercised by the defendants is the custody of the steamer "Lillie." The whole system and functions

WHITE *v.* HILL.

are changed. Many of the functions are abolished and new ones added. Many of those continued are now exercised by persons other than the parties to this action. The plaintiff certainly can not recover his lost office (if it has been recreated) from the defendants, because they *do* not have it.

In *Ward v. Elizabeth City,* 121 N. C., 1, it was held that the addition of some territory to the city made the office of City Attorney a new office. That decision has never been questioned.

It may be observed that chap. 18, Acts 1899, ratified February 28, 1899, amends the Act of 1897, by striking out Onslow and inserting Beaufort in line 5 of sec. 2; that it materially modified sec. 4; that it strikes out all duties to be done by the Chief Inspector and deputy inspectors in sec. 7, and provides that the statement required by sec. 7 shall be filed with "the Clerk of the Superior Court of the county where the said oysters are purchased." It repeals secs. 11, 12, 13, 15, 16, 17, 18 and 19, and leaves no law providing for a Chief Inspector or deputy inspectors. The repealing act went into effect on February 28, 1899. The act under which the defendants claim was ratified and went into effect on the 2nd of March, 1899. The words "deputy inspectors" in the Act of 1897, might mislead. They were not, in the ordinary sense of the word, deputies of the Chief Inspector, but were independent officers created for certain purposes with fixed functions and duties as set out in the act. They are called in secs. 15 and 16, and perhaps elsewhere, "inspectors." Their duties are prescribed by the statute, and are different from those of the chief. Their salary is paid by the State, they give bond to the State, they report to the Clerk of the Court, and turn over all taxes collected by them to said Clerk, etc. Their authority would evidently not terminate upon the death of the chief, whereas an ordinary deputy is

merely the agent of the officer, and can exercise only the functions his principal could exercise, and the officer is responsible for his acts (9 A. & E., 2nd Ed., 369), and his authority would cease upon the death of the principal (*Ibid,* 382), and the principal could remove him at pleasure. *Ibid,* 383; *Pilan v. Taylor,* 113 N. C., 1; *Lane v. Cotton,* 13 Mod. Rep., 477; *Coltraine v. McCain,* 14 N. C., 308. If the Court possessed the veto which our Constitution has denied to the Governor, it might say we will "not give effect to this act."

Besides, chap. 21, Laws 1899, expressly forbids the Treasurer to pay any officers claiming under the abolished Act of 1897. This not only puts the "intention" of the legislation beyond the power of legal construction, but the plaintiff, should he recover, obtains at most a barren sceptre. The legislative power is supreme over the public purse. The Conostitution, Art. XIV, sec. 3, provides that no money shall be drawn from the treasury but in consequence of appropriations made by law, i. e., by legislative authority. *Garner v. Worth,* 122 N. C., 250. And the Auditor's warrant would be no protection to the Treasurer. *Bank v. Worth,* 117 N. C., 146. Indeed, *Hoke v. Henderson,* 15 N. C., at bottom of page 27, expressly says the General Assembly has the power to withhold or forbid any payment, and as it further says the "emoluments" is the extent of the "property," how can the courts give any relief? As wisely pointed by the opinion in *Hoke v. Henderson,* the remedy, if the salary is wrongfully withheld by legislative action, is to wait for the people to correct the wrong in the election of new representatives.

The power of the purse is essentially the supreme power, and by it alone in England and in this country the power of the sword has been subordinated to the civil power. Legis-

lative bodies may act wrongly, but the remedy is with their master, the people, whose mere agent they are. The Legislature may act beyond its just limits, and so may the courts. There is no imputation of superior wisdom, power or patriotism in the courts. Each department should stay within its own limits. *Suum cuique.*